**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MICHAEL FLEURY,<br>individually and on behalf of the class<br>members described herein,<br><br>　　　Plaintiff,<br><br>　　　-vs-<br><br>GENERAL MOTORS LLC,<br><br>　　　Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | 1:22cv03862<br>Judge Kendall |

**SECOND AMENDED COMPLAINT  – CLASS ACTION**

1.　　Plaintiff Michael Fleury brings this action against Defendant General Motors LLC ("GM") to secure redress for the conduct of Defendant in selling and charging for Flex Fuel vehicles, supposedly designed to operate on E85 (85% ethanol) fuel, that cannot be regularly operated on E85 fuel without damage.

2.　　Defendant represents that the vehicles will operate on E85.  Defendant provides several warnings directly to consumers relating to the use of E85.  However, Defendant does not include a warning of the known, material fact that the owner must alternately fill the vehicle with E85 and gasoline to avoid damage and a safety hazard.

3.　　In fact, internal GM documents, dating back prior to the manufacture of Plaintiff's vehicle,  state that "excessive use of E85" may "caus[e] a plunger internal to the fuel pump to stick." This, in turn, causes often sudden lack of power and necessitates costly repairs, including replacement of the fuel pump.

4.　　This issue is not disclosed to consumers, who find out about the problem when it occurs.  If the person is operating the vehicle on the highway at the time it occurs, it is a significant safety hazard.

5.　　Plaintiff alleges violation of the Consumer Fraud Act and common law fraud.

1

## PARTIES

6.      Plaintiff Michael Fleury is a resident of Chicago, Illinois.

7.      Defendant GM is a limited liability company organized under Delaware law with its principal place of business at 300 Renaissance Center, Detroit, MI 48265.  Its registered agent and office in Illinois is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield , IL 62703.  The sole member and owner of GM is General Motors Holdings, LLC, a Delaware limited liability company with its principal place of business in Michigan. The sole member of General Motors Holdings LLC is General Motors Company, a Delaware corporation with its principal place of business in Michigan.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) (Class Action Fairness Act). There are over 100 proposed class members, most of whom are not citizens of Michigan or Delaware.  The claims of the proposed class members exceed the sum or value of $5,000,000, exclusive of interest and costs.

9.      Plaintiff is a citizen of Illinois, diverse from GM, General Motors Holdings LLC and General Motors Company. Most members of the class are of diverse citizenship from Defendant.

10.      Personal jurisdiction and venue are proper because Defendant GM intentionally markets and sells its products within the state of Illinois.

11.      GM seeks to promote the sale of used GM vehicles by GM dealers in Illinois, as well as new vehicles.  GM sells parts for used GM vehicles and its dealers service them.  The sale of used GM vehicles develops public desire for the purchase of new GM vehicles and helps support the GM dealer network, upon which GM relies for the distribution of new vehicles.   The presence on the market of a used GM vehicle often means that a prior owner of the vehicle is or recently has been in the market for a new GM vehicle.

## FACTS

### Plaintiff's purchase of Flex Fuel vehicle

12.     In October 2019, Plaintiff purchased a used 2016 Chevrolet Impala Flex Fuel vehicle from Advantage Chevrolet, an authorized GM dealer.

13.     Plaintiff had been interested in purchasing an Impala LTZ for quite some time, and the Flex Fuel feature provided additional incentive to purchase.

14.     The value of a Flex Fuel vehicle is greater than that of a comparable vehicle without that feature. The extra value has increased as of late with increased gasoline prices. In mid-2022, E85 sold for about $1.50 to $2 per gallon less than gasoline

15.     The vehicle was manufactured and placed in the stream of commerce by GM.

16.     Plaintiff purchased the vehicle for personal, family or household purposes (general transportation) and not business purposes.

17.     Defendant GM markets and sells Flex Fuel vehicles throughout the United States, including Illinois.

18.     Plaintiff was interested in the Flex Fuel feature and selected this Impala over a comparable one that did not have the Flex Fuel feature.

### Defendant's representations concerning meaning of "Flex Fuel"

19.     Prior to purchase Plaintiff received GM representations concerning the Flex Fuel feature.

20.     The vehicle purchased by Plaintiff had a prominent "E85" sticker in the window immediately above the fuel filler. (Appendix A)   It is not readily removable or meant to be removable. It is meant to be on the vehicle throughout its life. Plaintiff saw the sticker and relied on it in purchasing the vehicle.

21.     The fuel filler cap itself was corn yellow, which GM uses to denote a Flex Fuel vehicle. (Appendix B) It is also meant to be on the vehicle throughout its life.

22.     The fuel filler cap states the following:

3

E85 / Gasoline
Do not use additives
with E85 Fuel
TIGHTEN UNTIL ONE CLICK
Or Service Engine Light
May Turn On

Appendix C depicts a replacement fuel filler cap.

23.     The statement "E85 / Gasoline" conveys the meaning to consumers that they may

fill the tank with either E85 or gasoline, without restriction or   limitation beyond that stated

concerning additives.

24.     On information and belief, the fuel filler cap on all GM Flex Fuel vehicles contains

the same statements about E85.  The instructions for tightening the cap vary between vehicles, but

are not material.

25.     Fuel additives are generally fuel system cleaners that remove carbon and other

buildup from the fuel system.

26.     The fuel cap and sticker are direct communications from GM to any original or

subsequent purchaser  of the vehicle, and are so intended by GM.

27.     Vehicle manufacturers commonly provide information about fuel usage on or

adjacent to the fuel filler.  For example, instructions to use premium fuel or fuel of a certain octane

rating and similar restrictions are generally found in that location.

28.     The vehicle purchased by Plaintiff was advertised by Advantage Chevrolet as

containing an engine which "[i]ncludes E85 FlexFuel capability" online.  (Appendix D, p. 4) Plaintiff

saw and relied upon the advertisement.

29.     Although the advertisement was placed by Advantage Chevrolet, the specifications

advertised came from GM.

30.     GM has gone to great effort to create public understanding and secondary meaning

as to what "Flex Fuel" means.

31.     For many years, Defendant GM had represented to the public that Flex Fuel vehicles

4

can "run on E85 ethanol, gasoline, or any combination of the two." (General Motors Statement on Flex-Fuel Vehicle Pledge) (https://news.gm.com/newsroom.detail.html/Pages/news/us/en/2010 /May/0505_ flexfuel.html) (Appendix E).

32.     This press release remains on GM's website.

33.      This is the accepted meaning of "Flex Fuel" to the consuming public, intended by GM, and is conveyed by the statement that a vehicle is a "Flex Fuel" vehicle and the direction "E85 / Gasoline" on the filler cap.

34.     Similar statements were regularly made by GM to the public in other ways. For example, the annual report on SEC Form 10-K filed by General Motors Company for the year ending December 31, 2017 stated (original page 5) that "We offer a variety of FlexFuel vehicles in the U.S. for the 2018 model year to retail and commercial customers capable of operating on gasoline, E85 ethanol or any combination of the two." The same statement appears in the annual reports for 2018-2021.

35.     The quoted statements negate any requirement that E85 and gasoline must be used alternately. Running the vehicle on E85 100% of the time is permissible. Use of E85 90% of the time and gasoline 10% of the time is "any combination" and permissible.

**Provision of owners manual to Plaintiff and other owners**

36.     Plaintiff was provided with a hard copy of the GM owners manual pertaining to the vehicle at the time of purchase by Advantage Chevrolet.

37.     The owner's manual for the 2016 Chevy Impala purchased by Plaintiff is published on the Internet by GM as well. (https://www.chevrolet.com/bypass/pcf/gma-content-api/ resources/sites/GMA/content/staging/MANUALS/3000/MA3014/en_US/2.0/2k16impala2ndPr int.pdf)

38.     The owner's manual for the 2016 Chevy Impala is available on the Internet free of charge whether or not one purchases the vehicle.

39.     A copy of the manual is in Appendix F.

40. The owners manual is a direct communication by GM to both new and used vehicle purchasers.

41. The owners manual is intended to be, and is, relied upon by the ultimate consumer such as Plaintiff. It is not intended for use by GM dealers, who receive different types of product information from GM.

42. GM intended that purchasers rely upon the owners manual as containing the specifications of the vehicle, instructions for its proper maintenance and use, and all appropriate warnings and limitations relating to the particular make and model of vehicle, as opposed to cars generally.

43. Plaintiff did so rely, and believed that following the instructions in the manual would not cause or increase the risk of harm.

44. Vehicle manufacturers commonly provide warnings about fuel usage in the manual.

45. The fact that an accurate owners manual was being provided is part of what is being sold and became part of the basis of the bargain.

46. The affirmations and descriptions in the owners manual prepared by GM are part of what is being sold and became part of the basis of the bargain.

47. Plaintiff read the owner's manual whenever he had a question about the vehicle's features, operation or care.

48. Plaintiff would not have purchased the vehicle had he been told that the instructions for its use in the manual and on the vehicle itself were inaccurate and could cause harm if followed.

49. Plaintiff relied on:

    a. The fact that an accurate manual for the vehicle existed and was being provided, prior to purchase;

    b. The content of the manual, after purchase.

**Representations about Flex Fuel in owners manual**

50.     The owner's manual states:

a.      **E85 or FlexFuel**     Vehicles with a yellow fuel cap can use either unleaded gasoline or ethanol fuel containing up to 85% ethanol (E85). See *E85 or FlexFuel* => 239. For all other vehicles, use only the unleaded gasoline described under *Fuel* => 238.  (Appendix F, p. 27)

b.      If the vehicle has a yellow fuel cap, E85 or FlexFuel can be used in the vehicle. See *E85 or FlexFuel* => 240.  (Appendix F, p. 238).

c.      **E85 or FlexFuel**     Vehicles with a yellow fuel cap can use either unleaded gasoline or fuel containing up to 85% ethanol (E85). All other vehicles should use only the unleaded gasoline as described in *Fuel* =>238. (Appendix F, p. 240)

d.      ***The use of E85 or FlexFuel is encouraged when the vehicle is designed to use it.*** E85 or FlexFuel is made from renewable sources. To help locate fuel stations that carry E85 or FlexFuel, the U.S. Department of Energy has an alternative fuel website. See www.afdc.energy.gov/afdc/locator/stations. (Appendix F, p. 240, emphasis added).

e.      If the vehicle has E85 fuel capability, the fuel cap will be yellow and state that E85 or gasoline can be used. See *E85 or FlexFuel* => 240.  (Appendix F, p. 241).

51.     The owner's manual contains several warnings relating to Flex Fuel vehicles:

a.      The starting characteristics of E85 or FlexFuel make it unsuitable for use when temperatures fall below -18 °C (0 °F). Use gasoline or add gasoline to the E85 or FlexFuel.  (Appendix F, p. 240)

b.      Because E85 or FlexFuel has less energy per liter (gallon) than gasoline, the vehicle will need to be refilled more often. See *Filling the Tank* => 240.

7

(Appendix F, p. 240)

c.    E85 or FlexFuel should meet ASTM Specification D 5798 or CAN/
CGSB–3.512 in Canada. Do not use the fuel if the ethanol content is greater
than 85%. Fuel mixtures that do not meet ASTM or CGSB specifications
can affect driveability and could cause the malfunction indicator lamp to
come on. (Appendix F, p. 240)

52.    The fuel filler cap contains the further warning that additives cannot be used with
E85. (Appendices B-C)

53.    There is no warning anywhere on material furnished to the purchaser about
alternating E85 with gasoline at a frequency of filling up with gasoline every other tank or every
third tank to prevent damage.

54.    The statements on pp. 240-41 of the owners manual are the only ones indexed under
Flex Fuel in the manual.

55.    The statement on p. 121 of the owners manual (Appendix F) that "Poor fuel quality
can cause inefficient engine operation and poor driveability" and cause the engine warning light to
illuminate has nothing to do with the need to alternate E85 with gasoline. The instruction to
"change the fuel brand" for "at least one full tank" is *not* an instruction to use gasoline instead of
E85. It would not be so interpreted by a reasonable consumer. "Fuel brand" means Mobil, Exxon,
BP, Thornton's, etc. E85, as opposed to gasoline or diesel, is the type of fuel, not its brand.
Furthermore, a statement about what to do if one purchases poor quality fuel does not describe the
need to alternate use of gasoline and E85, even if both fuels are of good quality.

56.    The statement on p. 121 is not indexed under Flex Fuel. No consumer looking for
information about Flex Fuel would consult p. 121.

57.    The presence of several warnings and no others in GM's communications to Plaintiff
and other purchasers of Flex Fuel vehicles (in the manual and on the fuel filler cap) conveys the
meaning to consumers that there are no other limitations or restrictions on the use of E85.

8

58.     The statement in the owners manual (Appendix F, p. 240) that "The use of E85 or FlexFuel is encouraged when the vehicle is designed to use it" conveys the meaning to consumers that the owner of a Flex Fuel vehicle can use it to the maximum extent E85 is available.  The statement would be so interpreted by the consumer, and is flatly contrary to the proposition that frequent use of gasoline is necessary to avoid damage.  It is a misleading statement when use of E85 more than 50 to 66% of the time causes serious damage to the car.

59.     The quoted statements are typical of those in the owners' manuals of GM Flex Fuel vehicles.

60.     GM has also stated to the public that "Initiatives to expand the infrastructure for flex-fuel vehicles are extremely important . . . and that the additional pumps need to be put where the vehicles are located. While the largest concentrations of flex-fuel vehicles are found in the highest-population areas, two thirds of the current E85 stations, are in 10 Midwestern states. Ninety percent of registered flex-fuel vehicles don't have an E85 station in their zip code, and nearly 50%, don't have E85 in their county, Stephens said. The US will need about 10,000 more pumps to put ethanol fuel within 2 miles of customers."  (Appendix G, see also Appendices H-J) This also conveys the meaning to consumers that E85 is preferred when it is available.

61.     That E85 may be used continuously  is also the meaning conveyed by GM directing the consumer (Appendix F, p. 240) to official maps showing where fuel stations dispensing E85 are located.  (Appendix K)  This enables and encourages vehicle owners driving long distances to select a route that enables them to use only E85 and not use gasoline.

62.     The inability of GM Flex Fuel vehicles to be used in the manner that GM represents they can be used is a defect.

63.     If GM Flex Fuel vehicles cannot safely be used on E85 only, providing information that enables owners to use only E85 and not gasoline on a long trip is likely to strand them far from home.

64.     In light of the statements that GM made to encourage the use of E85,  and its

9

statement of several limitations on the use of E85, GM was obligated to inform consumers of the existence of a known, additional material limitation on the ability of Flex Fuel vehicles to safely operate on E85.

## Harm to Plaintiff

65.     In 2022, after the price of gasoline increased, Plaintiff began using E85 regularly.

66.     Although Plaintiff believed, based on the statements on the vehicle and the filler cap, that he could use E85 regularly, Plaintiff consulted the owners manual to make sure that there were no warnings or prohibitions about his intended use of E85.  He found none.

67.     Plaintiff had used E85 on several occasions before, without any consequences other than the lower mileage stated in the manual.

68.     Plaintiff complied with the instruction on the fuel filler cap regarding not using additives.

69.     About the beginning of April 2022, subsequent to such regular use, while Plaintiff was driving the vehicle, the check engine light came on, a warning light displayed, and the vehicle lost power, such that it could not be safely driven on public roads.

70.     The temperature was well in excess of -18 °C (0 °F).

71.     Plaintiff had no idea what the problem was, and did not draw any connection between the problem and E85.

72.     On April 5, 2022, Plaintiff brought the vehicle to Advantage Chevrolet, where the service department found that the vehicle had "low fuel pressure from high pressure fuel pump," that the "high pressure fuel pump needs to be replaced per bulletin #18-NA-072," and that the problems were related to the use of E85 fuel.  (Appendix L).

73.     While he was at Advantage Chevrolet on April 5, 2022, Service Advisor Owen Suarez came up to Plaintiff and asked him if he was using E85 – specifically, whether he had mixed it with gasoline. When Plaintiff stated that he had lately been using E85 exclusively, Owen informed him that he should have been alternating fillups between E85 and gasoline, and that failing to do so

caused the problems his vehicle was having.

74.     This was the first time Plaintiff was told that he could not use E85 exclusively.

75.     The Advantage Chevrolet invoice specifically notes "Concern CUSTOEMR [sic] STATES HE IS USING E85."

76.     No reasonable consumer would understand that they could not use E85 exclusively.

**Defendant's knowledge of Flex Fuel hazard**

77.     Service Bulletin 18-NA-072 describes a fuel pump problem attributed to "excessive use of E85, causing a plunger internal to the fuel pump to stick." (Appendix M).

78.     The Bulletin states that the fuel tank should be filled with gasoline one-third or one-half of the time. (Appendix M).

79.     The Bulletin is dated March 2020 but replaced similar April 2018 (Appendix N) and January 2019 (Appendix O) Bulletins.

80.     Service Bulletin 18-NA-072 replaced an earlier Bulletin designated PIP5385, originally issued in March 2016 (Appendix P) and revised in April 2016 (Appendix Q), January 2017 (Appendix R) and January 2018 (Appendix S). Editions of PIP5385 are denoted by a letter following 5385.

81.     Defendant GM knew of the fuel pump problem caused by "excessive use" of E-85 since no later than early 2016.

82.     The ordinary consumer does not consult GM Service Bulletins prior to purchase. The Service Bulletins are numerous and are not distributed to consumers. They are intended for GM and dealer service personnel, contain language requiring a knowledge of automobile mechanics to properly understand, and often expressly state that they are not for do-it-yourselfers.

83.     Problems with Flex Fuel vehicles malfunctioning while using E85 fuel have been known by GM since prior to the time the vehicle purchased by Plaintiff (a) was first placed in service or (b) sold to Plaintiff.

84.     GM's policy was to not inform vehicle owners or prospective vehicle owners of the

need to alternatively use E85 and gasoline prior to malfunction.

## Damage

85.　Plaintiff failed the Illinois emissions test on July 9, 2022.　(Appendix T)

86.　AutoZone informed Plaintiff that he would need a new mass air flow sensor to pass.

87.　On information and belief the mass air flow sensor needs to be replaced because of the ongoing failure of the high pressure fuel pump.

88.　Initially, Advantage Chevrolet had Plaintiff pay for diagnosis of the problem and asked Plaintiff to pay for repairs.

89.　After Plaintiff complained to the Better Business Bureau, GM offered to "fix" the fuel pump.

90.　However, the "fix" would not have relieved Plaintiff of the need to use gasoline every second or third fillup or fully compensated Plaintiff.

91.　There is no way in which a GM Flex Fuel vehicle can be operated exclusively on E85 without substantial risk of damage.

92.　In short, the GM Flex Fuel vehicles *cannot* be made to conform to the representations concerning Flex Fuel made by GM.　GM's statement in the owners manual that "The use of E85 or FlexFuel is encouraged when the vehicle is designed to use it," is misleading and an invitation to cause expensive damage to the vehicle in a manner likely to constitute a safety hazard.

93.　GM has aggressively promoted the benefits of Flex Fuel since about 2006. (Appendices E, I-J).　For more than 15 years, all GM Flex Fuel vehicles have been equipped with yellow, corn-colored filler caps to signify that they take E85 fuel.

94.　There is substantial public demand for Flex Fuel vehicles, which are perceived as environmentally friendly.　Demand for Flex Fuel vehicles is greater in the Midwest and Illinois, as corn is grown and ethanol produced locally, reducing the cost of ethanol.　The four states that produce the largest amount of ethanol are Iowa, Nebraska, Illinois and Minnesota, in that order.

95.     Millions of Flex Fuel vehicles have been sold in the United States by GM. According to statistics maintained by the Secretary of State of Illinois, there are about 1.1 million Flex Fuel vehicles of all makes registered in Illinois. (Appendix U). GM sells 15-16% of all new vehicles sold in the United States and a higher percentage of Flex Fuel vehicles. This amounts to thousands of GM Flex Fuel new and used vehicles sold per year in Illinois.

96.     Plaintiff and every other purchaser of a Flex Fuel vehicle (new or used) received GM's representations that the vehicle purchased was a Flex Fuel vehicle that could be safely and reliably operated on E85 fuel, including the yellow, corn-colored filler cap on the vehicle.

97.     On information and belief, GM has used yellow filler caps on all of its Flex Fuel vehicles since 2006.

98.     Plaintiff and every other purchaser of a Flex Fuel vehicle (new or used) received GM's statements that there were several  limitations on the use of E85:

a.      The starting characteristics of E85 or FlexFuel make it unsuitable for use when temperatures fall below -18 °C (0 °F). Use gasoline or add gasoline to the E85 or FlexFuel. (Appendix F, p. 240)

b.      Because E85 or FlexFuel has less energy per liter (gallon) than gasoline, the vehicle will need to be refilled more often. See *Filling the Tank* => 240. (Appendix F, p. 240)

c.      E85 or FlexFuel should meet ASTM Specification D 5798 or CAN/ CGSB–3.512 in Canada. Do not use the fuel if the ethanol content is greater than 85%. Fuel mixtures that do not meet ASTM or CGSB specifications can affect driveability and could cause the malfunction indicator lamp to come on. (Appendix F, p. 240)

d.      Do not use additives with E85. (Appendices B-C)

99.     Plaintiff would not have purchased a Flex Fuel vehicle, would not have paid as much for it, or would have purchased another vehicle altogether, had he been apprised prior to

13

purchase of:

      a.     The "excessive use" problem;

      b.     That the instructions for the use of the vehicle in the manual and on the vehicle itself were inaccurate or incomplete and could cause harm if followed.

100.    Had the owners manual or other instructions that came with the vehicle told Plaintiff to alternately use of E85 and gasoline, he would have followed such instructions, and not incurred damage.

101.    GM could readily have notified Flex Fuel vehicle owners that they should fill their vehicles with gasoline at periodic intervals. However, doing so would have diminished the public desire for and perceived value of Flex Fuel vehicles.

102.    GM intentionally determined not to alert vehicle owners.

103.    Under the Corporate Average Fuel Economy (CAFÉ) requirements, GM receives a fuel economy credit for every Flex Fuel vehicle sold. Actual fuel usage is not monitored.

## COUNT I – ILLINOIS CONSUMER FRAUD ACT – DECEPTIVE PRACTICES

104.    Plaintiff incorporates paragraphs 1-103.

105.    It is deceptive, in violation of 815 ILCS 505/2, for GM to promote the sale of Flex Fuel vehicles and make the representations to consumers concerning the use of E85 and limitations on such use found on the vehicle and in its manual, without disclosing the material fact that Flex Fuel vehicles should be filled with gasoline rather than E85 every second or third fillup.

106.    The fact that continuous use of E85 may cause sudden loss of power or severe damage is a material fact to any owner or prospective owner of a Flex Fuel vehicle, which Defendant was obligated to disclose. *Lipinski v. Martin J. Kelly Oldsmobile, Inc.*, 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70 (1st Dist. 2001).

107.    Purchasers of Flex Fuel vehicles who are not told that continuous use of E85 may cause sudden loss of power or severe damage would not realize or expect such result in the absence

14

of affirmative disclosure by GM.

108.     A prospective purchaser of a Flex Fuel vehicle who wished to inquire about the extent of Flex Fuel capability would look up the manual (which is available free on line without having to purchase the vehicle) or check GM's public statements on the subject, which are that Flex Fuel vehicles can "run on E85 ethanol, gasoline, or any combination of the two."

109.     The owners would have either not purchased Flex Fuel vehicles, paid less for them, or alternately used gasoline and E85, had disclosure been made.

110.     Defendant failed to disclose this material fact to induce reliance, i.e., because disclosure would have reduced sales of GM Flex Fuel vehicles.

111.     Defendant's affirmative false and misleading statements include:

   a.     The E85 sticker, yellow fuel cap, and statements on the fuel cap.

   b.     **E85 or FlexFuel**     Vehicles with a yellow fuel cap can use either unleaded gasoline or ethanol fuel containing up to 85% ethanol (E85). See *E85 or FlexFuel* => 239. For all other vehicles, use only the unleaded gasoline described under *Fuel* => 238.  (Appendix F, p. 27)

   c.     If the vehicle has a yellow fuel cap, E85 or FlexFuel can be used in the vehicle. See *E85 or FlexFuel* => 240.  (Appendix F, p. 238).

   d.     **E85 or FlexFuel**     Vehicles with a yellow fuel cap can use either unleaded gasoline or fuel containing up to 85% ethanol (E85). All other vehicles should use only the unleaded gasoline as described in *Fuel* =>238. (Appendix F, p. 240)

   e.     ***The use of E85 or FlexFuel is encouraged when the vehicle is designed to use it.*** E85 or FlexFuel is made from renewable sources. To help locate fuel stations that carry E85 or FlexFuel, the U.S. Department of Energy has an alternative fuel website. See www.afdc.energy.gov/afdc/locator/stations. (Appendix F, p. 240, emphasis added).

15

f.  If the vehicle has E85 fuel capability, the fuel cap will be yellow and state that E85 or gasoline can be used. See *E85 or FlexFuel* => 240.  (Appendix F, p. 241).

112.  The presence in the owner's manual and on the filler cap of several warnings relating to the use of E85, but nothing about alternating E85 with gasoline at a frequency of filling up with gasoline every other tank or every third tank to prevent damage, convey to the average consumer that these are the only systemic problems from regular use of E85.

## CLASS ALLEGATIONS

113.  Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

114.  The class consists of (a) all persons with Illinois addresses, (b) who purchased a GM Flex Fuel vehicle, new or used, (c) on or after a date 3 years prior to the filing of this action.

115.  Excluded from the class are Defendant; any affiliate, parent, or subsidiary of Defendant; any GM dealer; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel for plaintiff in this action; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to them, as well as the spouses of such persons.

116.  The class has over 40 members and is so numerous that joinder of all members is not practicable.

117.  There are common questions of law and fact with respect to the class, which common questions predominate over questions affecting only individual class members. These common questions include:

a.  Whether the Flex Fuel vehicles cannot continuously use E85 fuel.

b.  Whether Defendant engaged in deceptive practices by stating several limitations on the use of E85 fuel, while failing to disclose the need to

16

alternate use of gasoline and E85 fuel.

118.    Plaintiff will fairly and adequately represent the class.  There is no conflict of interest between the Plaintiff and the class members.  Plaintiff has retained counsel competent and experienced in class action litigation, and intends to prosecute this action vigorously.

119.    Plaintiff's claims are typical of those of the proposed class and  have the same legal and factual basis as the claims of the class members.

120.    A class action is a superior means for the fair and efficient adjudication of this dispute. While the individual injuries suffered by each proposed class member are meaningful, they are sufficiently small that individual actions are not economical.  Even if class members could afford individual litigation, there is no reason to burden the courts with multiple actions seeking modest damages.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and subclass members and against Defendant for the following relief:

i.      Actual damages;

ii.     Punitive damages;

iii.    Attorney's fees, litigation expenses and costs;

iv.     Such other or further relief as the Court deems proper.

### COUNT II – ILLINOIS CONSUMER FRAUD ACT  – UNFAIR PRACTICE

121.    Plaintiff incorporates paragraphs 1-103.

122.    The sudden failure of Flex Fuel vehicles presents a safety hazard to both the persons in the vehicle and other vehicles or persons in the immediate vicinity at the time of failure.

123.    It is an unfair practice, in violation of 815 ILCS 505/2, for GM  to put vehicles on the road that are known to present a serious potential for sudden failure when operated in complete accordance with the owners manual and other instructions by Defendant, without including in such communications warnings necessary to avoid the hazard.

124.    The marketing of vehicles containing an undisclosed safety hazard is contrary to

17

public policy.

125. Consumers who are not told that they must use gasoline every second or third fillup are highly unlikely to realize that is required, and cannot avoid the hazard.

126. Furthermore, since the persons endangered by the sudden failure of Flex Fuel vehicles are not limited to the purchaser or lessee, but include anyone in the vicinity when the failure occurs, proper warnings are essential.

127. The sale of Flex Fuel vehicles without warnings in order to further Defendant's profits and CAFÉ numbers is unscrupulous and unethical.

## CLASS ALLEGATIONS

128. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

129. The class consists of (a) all persons with Illinois addresses, (b) who purchased a GM Flex Fuel vehicle, new or used, (c) on or after a date 3 years prior to the filing of this action.

130. Excluded from the class are Defendant; any affiliate, parent, or subsidiary of Defendant; any GM dealer; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel for plaintiff in this action; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to them, as well as the spouses of such persons.

131. The class has over 40 members and is so numerous that joinder of all members is not practicable.

132. There are common questions of law and fact with respect to the class, which common questions predominate over questions affecting only individual class members. These common questions include:

      a.    Whether the Flex Fuel vehicles cannot continuously use E85 fuel.

      b.    Whether the sale of Flex Fuel vehicles without adequate warning of a safety

hazard in GM's communications concerning the operation and use of the vehicles is unfair.

133.    Plaintiff will fairly and adequately represent the class.  There is no conflict of interest between the Plaintiff and the class members.  Plaintiff has retained counsel competent and experienced in class action litigation, and intends to prosecute this action vigorously.

134.    Plaintiff's claims are typical of those of the proposed class and  have the same legal and factual basis as the claims of the class members.

135.    A class action is a superior means for the fair and efficient adjudication of this dispute. While the individual injuries suffered by each proposed class member are meaningful, they are sufficiently small that individual actions are not economical.  Even if class members could afford individual litigation, there is no reason to burden the courts with multiple actions seeking modest damages.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and subclass members and against Defendant for the following relief:

    i.       Actual damages;

    ii.      Punitive damages;

    iii.     Attorney's fees, litigation expenses and costs;

    iv.     Such other or further relief as the Court deems proper.

## COUNT III  – FRAUD BY MISLEADING STATEMENT OR HALF-TRUTH

136.    Plaintiff incorporates paragraphs 1-103.

137.    Defendant GM committed fraud when it made statements concerning the use of E85 in its vehicles which are seriously misleading because they do not state matters which materially qualify the statements made.

138.    Defendant's  misleading statements include:

    a.      The E85 sticker, yellow fuel cap, and statements on the fuel cap.

    b.      **E85 or FlexFuel**   Vehicles with a yellow fuel cap can use either unleaded

19

gasoline or ethanol fuel containing up to 85% ethanol (E85). See *E85 or FlexFuel* => 239. For all other vehicles, use only the unleaded gasoline described under *Fuel* => 238. (Appendix F, p. 27)

c.   If the vehicle has a yellow fuel cap, E85 or FlexFuel can be used in the vehicle. See *E85 or FlexFuel* => 240. (Appendix F, p. 238).

d.   **E85 or FlexFuel**   Vehicles with a yellow fuel cap can use either unleaded gasoline or fuel containing up to 85% ethanol (E85). All other vehicles should use only the unleaded gasoline as described in *Fuel* =>238. (Appendix F, p. 240)

e.   ***The use of E85 or FlexFuel is encouraged when the vehicle is designed to use it.*** E85 or FlexFuel is made from renewable sources. To help locate fuel stations that carry E85 or FlexFuel, the U.S. Department of Energy has an alternative fuel website. See www.afdc.energy.gov/afdc/locator/stations. (Appendix F, p. 240, emphasis added).

f.   If the vehicle has E85 fuel capability, the fuel cap will be yellow and state that E85 or gasoline can be used. See *E85 or FlexFuel* => 240. (Appendix F, p. 241).

139.   The provision of several warnings relating to Flex Fuel vehicles in the owners manual and on the filler cap, but nothing about alternating E85 with gasoline at a frequency of filling up with gasoline every other tank or every third tank to prevent damage, is misleading.

140.   Once GM made any statements about limitations or conditions on the operation of the vehicle with E85 fuel, it was obligated to fully disclose such limitations and conditions.

141.   Defendant failed to make such disclosures in order to encourage (a) the purchase of Flex Fuel vehicles and (b) maximum use of E85 fuel in those vehicles.

142.   Defendant knew,  since prior to the time the vehicle purchased by Plaintiff (a) was first sold at retail  or (b) sold to Plaintiff, that GM  Flex Fuel vehicles needed to be filled with

gasoline every second or third fillup to avoid damage.

143.     Defendant also knew that neither Plaintiff nor other purchasers could reasonably discover that fact.

144.     The problem with "excessive use" of E85 is a material fact because:

a.     The economic and environmental benefit of E85 depends on using it as much as possible.

b.     No one would pay thousands of dollars for a vehicle and then regularly fill it with a distinctive type of fuel if they knew that doing so would cause damage.

## CLASS ALLEGATIONS

145.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R.Civ.P. 23(a) and (b)(3).

146.     The class consists of (a) all persons with Illinois addresses, (b) who purchased a GM Flex Fuel vehicle, new or used, (c) on or after a date 5 years prior to the filing of this action.

147.     Excluded from the class are Defendant; any affiliate, parent, or subsidiary of Defendant; any GM dealer; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel for plaintiff in this action; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to them, as well as the spouses of such persons.

148.     The class has over 40 members and are so numerous that joinder of all members is not practicable.

149.     There are common questions of law and fact with respect to the class, which common questions predominate over questions affecting only individual class members. These common questions include:

a.     Whether the Flex Fuel vehicles cannot continuously use E85 fuel.

b.     Whether Defendant engaged in fraud by making the representations

21

described above, while failing to disclose the need to alternate use of gasoline and E85 fuel.

150. Plaintiff will fairly and adequately represent the class. There is no conflict of interest between the Plaintiff and the class members. Plaintiff has retained counsel competent and experienced in class action litigation, and intends to prosecute this action vigorously.

151. Plaintiff's claims are typical of those of the proposed class and have the same legal and factual basis as the claims of the class members.

152. A class action is a superior means for the fair and efficient adjudication of this dispute. While the individual injuries suffered by each proposed class member are meaningful, they are sufficiently small that individual actions are not economical. Even if class members could afford individual litigation, there is no reason to burden the courts with multiple actions seeking modest damages.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and subclass members and against Defendant for the following relief:

    i.     Actual damages;

    ii.    Punitive damages;

    iii.   Costs;

    iv.   Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Carly M. Roman
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

22

## JURY DEMAND

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Carly M. Roman
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

24

## CERTIFICATE OF SERVICE

Daniel A. Edelman certifies that on February 20, 2023 this document was filed via ECF, causing a copy to be sent to all counsel of record.

*/s/ Daniel A. Edelman*
Daniel A. Edelman